IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| DAVID A. PAGE,<br><br>Plaintiff,<br><br>vs.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>Defendant. | CV 12–174–M–DLC-JCL<br><br><br>FINDINGS &<br>RECOMMENDATION |

Plaintiff David Page brings this action under 42 U.S.C. § 405(g) seeking

judicial review of the decision of the Commissioner of Social Security denying his

application for disability insurance benefits under Title II of the Social Security

Act, 42 U.S.C. §§ 401-433.   Page protectively filed his benefit application on

August 18, 2010, alleging disability since May 14, 2010, due to narcolepsy.  (Tr.

166-67; 202).  After an administrative hearing, at which Page appeared with

counsel, an Administrative Law Judge ("ALJ") found that Page was not disabled.

Tr. 20-31.  The Appeals Council denied Page's subsequent request for review,

thereby making the ALJ's decision the agency's final decision for purposes of

judicial review. (Tr. 1-6).  Jurisdiction vests with this Court pursuant to 42 U.S.C.

§ 405(g).

Page was 43 years old at the time of his alleged onset date, and 45 years old at the time of the ALJ's decision.

# I.     Standard of Review

This Court's review is limited.  The Court may set aside the Commissioner's decision only where the decision is not supported by substantial evidence or where the decision is based on legal error.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Widmark v. Barnhart,* 454 F.3d 1063, 1070 (9th Cir. 2006).

"The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities."  *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).  This Court must uphold the Commissioner's findings "if supported by inferences reasonably drawn from the record."  *Batson v. Commissioner of Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "[I]f evidence exists to support more than one rational interpretation," the Court "must defer to the Commissioner's decision."  *Batson*, 359 F.3d at 1193 (*citing Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).  This Court

"may not substitute its judgment for that of the Commissioner." *Widmark*, 454

F.3d at 1070 (*quoting Edlund*, 253 F.3d at 1156).

## II.   **Burden of Proof**

To establish disability, a claimant bears "the burden of proving an 'inability

to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which...has lasted or can be expected

to last for a continuous period of not less than 12 months.'" *Batson*, 359 F.3d at

1193-94 (*quoting* 42 U.S.C. § 423(d)(1)(A)).

In determining whether a claimant is disabled, the Commissioner follows a

five-step sequential evaluation process.  20 C.F.R. § 404.1520.  The claimant bears

the burden of establishing disability at steps one through four of this process.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).    At the first step, the ALJ

will consider whether the claimant is engaged in "substantial gainful activity."  20

C.F.R. § 404.1520(a)(4)(I).  If not, the ALJ must determine at step two whether the

claimant has any impairments that qualify as "severe" under the regulations.  20

C.F.R. § 404.1520(a)(4)(ii).  If the ALJ finds that the claimant does have one or

more severe impairments, the ALJ will compare those impairments to the

impairments listed in the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).  If the ALJ

finds at step three that the claimant has an impairment that meets or equals a listed

impairment, then the claimant is considered disabled. 20 C.F.R. §

404.1520(a)(iii). If, however, the claimant's impairments do not meet or equal the

severity of any impairment described in the Listing of Impairments, then the ALJ

must proceed to step four and consider whether the claimant retains the residual

functional capacity (RFC) to perform his or her past relevant work. 20 C.F.R. §

404.1520(a)(4)(iv). If the claimant establishes an inability to engage in past work,

the burden shifts to the Commissioner at step five to establish that the claimant

can perform other work in the national economy. 20 C.F.R. § 404.1520(a)(4)(v).

## III. <u>Discussion</u>

Following the steps in the sequential evaluation process, the ALJ first found

that Page meets the insured status requirement of the Act through December 31,

2015. (Tr. 22). The ALJ noted that Page stopped working as a truck driver on his

alleged onset date of May 14, 2010, and then received unemployment benefits

until sometime in 2011. (Tr. 22). The ALJ found that Page had not engaged in

substantial gainful activity since his alleged onset date. (Tr. 22). Moving to step

two, the ALJ found that Page had the following severe impairments: narcolepsy

and chronic neck and back pain. (Tr. 22). At step three, the ALJ determined that

Page did not have an impairment or combination of impairments that met or

medically equaled any impairment described in the Listing of Impairments. (Tr.

23). The ALJ also found that while Page's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," his "statements concerning the intensity, persistence, and limiting effects of th[o]se symptoms" were not entirely credible. (Tr. 25). The ALJ then determined that Page could perform medium work, as long as it did not require climbing ladders or scaffolds, exposure to unprotected heights, or operating dangerous moving machinery. (Tr. 24). In light of the those restrictions, the ALJ found that Page could not perform his past relevant work as a carpet cleaner, oil changer, or truck driver. (Tr. 29). Finally, at step five, the ALJ found that Rule 203.26 of the Medical Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2 (the "Grids") directed a finding that Page was not disabled. (Tr. 30).

## A.    Severe Impairments

Page argues the ALJ erred at step two by not including depression among the list of his severe impairments.[1] (Doc. 24, at 17). As the claimant, Page bears the burden of establishing the severity of his alleged impairments by providing medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § 416.908. The ALJ may nonetheless have a duty to develop the record as

---

[1] To the extent Page argues the ALJ also erred by finding that his sleep disorder was severe, (doc. 24, at 17), he overlooks the fact that ALJ did categorize his narcolepsy as a severe impairment.

to an alleged mental impairment when "there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001). And if a claimant presents a "colorable claim of mental impairment," the ALJ must evaluate that alleged impairment using the special psychiatric review technique described in 20 C.F.R. §§ 404.1520a, 416.920a. *Keyser v. Comm'r Soc. Sec. Admin*, 648 F.3d 721, 726 (9th Cir. 2011).

Review of the administrative record in this case reflects that Page did not allege depression as a basis for disability, either in his application for benefits or at the administrative hearing. (Tr. 48-85; 202). Page's benefit application identified narcolepsy as the sole basis for his alleged disability. (Tr. 202). And when the ALJ specifically inquired at the administrative hearing whether Page was alleging disability based on any other impairments, he stated that he was not. (Tr. 52). Page's attorney, who was present at the administrative hearing and is representing him in the current proceedings, did not argue that Page suffered from depression or otherwise raise the issue during the course of the administrative proceedings.

Even now, Page does not point to any evidence that he was ever diagnosed with depression, or that depression significantly limited his ability to perform basic work activities. Page simply argues without citing any medical evidence

that his depression was severe and the ALJ erred by finding otherwise. (Doc. 24, at 17-20). It appears based on the Court's review of the record that Page's treating physician, Dr. Patrick Burns, simply noted on one occasion in September 2010 that Page might "be having some depression as he is going through a divorce, but it is hard to know for certain whether or not that is the problem." (Tr. 269). There is no indication that Dr. Burns or any other medical provider diagnosed Page with depression. While Page's wife wrote in a supporting lay witness statement that he seemed depressed because he preferred staying busy, that isolated remark was not enough to trigger a duty on the ALJ's part to further develop the record as the presence of an alleged mental impairment. The Court thus concludes that the record was not ambiguous or inadequate, and Page did not present a colorable claim of mental impairment. Page's argument that the ALJ erred by not including depression among the list of his severe impairments is without merit.

Page next argues the ALJ erred by not classifying his "hobo spider bite (neck abscess), recurrent sebaceous cyst and MRSA condition" as a severe impairment. (Doc. 24, at 18). Page is mistaken. The ALJ recognized that Page "had a history of intermittent treatment" for "painful sebaceous scysts/lesions on his neck or head (MRSA positive)," which "were thought to be related back to

chronic infection from a spider bite in 2007." (Tr. 22). As the ALJ noted, however, Dr. Charles Dixon reported in February 2009 – more than a year before Page's alleged onset date – that Page's "MRSA furuncles" were resolved. (Tr. 22, 254). The record reflects that Page thereafter visited the emergency room because of a small abscess on his head in July 2009, and in September 2010 complained to his treating physician Dr. Lisa Fleischer of "reoccurent lesions on right buttock cheek for 1-2 years." (Tr. 345, 367). But there is nothing in these notes, or anything else that Page points to, to suggest that his intermittent bacterial skin disorder would have had a significant impact on his ability to perform work related activities. The ALJ's step two analysis is thus supported by substantial evidence.

## B. Listed Impairments

Page argues the ALJ erred at step three by finding that he did not satisfy the criteria for presumptive disability under Listing 3.10 for sleep-related breathing disorders.[2] At this third step in the sequential evaluation process, the ALJ must

_____

[2] At one point in his opening brief, Page also claims that the ALJ failed to consider whether he was disabled under Listing 12.05(C) based on mental retardation. (Doc. 24, at 16). But this is Page's only reference to Listing 12.05(C). He makes no supporting argument whatsoever that he somehow satisfies the criteria of this particular listing. Page did not allege disability based on mental retardation at the administrative level and did not raise the issue in front of the ALJ. Page does not point to any medical evidence suggesting that he satisfies the listing, and the Court

consider whether the claimant's impairment, or combination of impairments, meets or equals an impairment listed in 20 C.F.R. P. 404, Subpt. P, App. 1. "If the claimant meets or equals one of the listed impairments, a conclusive presumption of disability applies." *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990). To meet the requirements of a listing, the claimant "must have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d).

To demonstrate medical equivalence, the claimant must have impairments, considered alone or in combination, that are "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 404. 1526(a). The Ninth Circuit has made clear that the "ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment." *Lewis v. Apfel*, 236 F f.3d 505, 512 (9th Cir. 2001). Nevertheless, the burden remains with the claimant, who must present medical evidence that his impairments meet or medically equal all of the criteria of a listed impairment. *See Sullivan v. Zebley*, 493 U.S. 521, 531 (1990).

Listing 3.10 provides that alleged disability based on sleep-related breathing

---

sees nothing in the record to suggest that Page suffers from mental retardation within the meaning of Listing 12.05(C).

disorders is to be evaluated under the criteria of Listing 3.09 for chronic cor pulmonale secondary to chronic pulmonary vascular hypertension, or Listing 12.02 for organic mental disorders. 20 C.F.R. pt. 404, subpt. P, app. 1 § 3.10. Page claims the Listings 3.10 and 12.02 are the most applicable (doc. 24, at 16), and does not argue that he somehow meets or equals the criteria of Listing 3.09.

To meet Listing 12.02, a claimant must have an organic mental disorder that satisfies the requirements of paragraphs A and B or paragraph C. Paragraph A requires that a claimant show "a loss of specific cognitive abilities or affective changes" and "medically documented persistence" of at least one of the following: (1) disorientation as to time and place; (2) memory impairment; (3) perceptual or thinking disturbances; (4) change in personality; (5) disturbance in mood; (6) emotional lability; (7) loss of measured intellectual ability. Even if Paragraph A is satisfied, a claimant must also meet the paragraph B criteria, which require that a claimant's mental impairment result in at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistent or pace; (4) repeated episodes of decompensation, each of extended duration.

Alternatively, a claimant may satisfy Listing 12.02's C criteria by

demonstrating a medically documented history of a mental disorder (at least two years in duration) that has more than minimally limited the claimant's ability to do basic work activities and one of the following (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that results in decompensation with even a minimal increase in mental demands or change in the environment; or (3) current history of at least one year of inability to function outside a highly supportive living arrangement. 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.02.

In February 2012, Page's counsel asked treating neurologist and sleep medicine specialist Dr. Patrick Burns to consider whether Page's impairments met or equaled the criteria of Listings 3.10 and 12.02. (Tr. 479-80). Dr. Burns had diagnosed Page with narcolepsy in June 2005, and treated him for several years by prescribing a daily course of Ritalin. (Tr. 268–93; 353-64). Dr. Burns indicated by check-mark on the form provided by counsel that Page equaled the criteria of both listings. (Tr. 480). He indicated that Page's impairments would frequently interfere with his attention and concentration, and concluded he would not be able to perform light or sedentary work on a sustained full-time basis. (Tr. 480-81). In an accompanying narrative, Dr. Burns explained that "[n]arcolepsy is a lifelong

condition that will not spontaneously improve" and is "characterized by episodes of uncontrolled sleepiness." (Tr. 478). Dr. Burns wrote that narcolepsy "can also produce problems with judgment [and] concentration" and "is a condition that produces severe disability and would be analogous to other conditions like sleep-related breathing disorders that are uncontrolled or organic mental disorders due to the effects of his unpredictable drowsiness and sleepiness and how it can interfere with mental capabilities." (Tr. 478).

The ALJ considered Dr. Burns' opinion regarding the Listings, but rejected it for a number of clear and convincing reasons.[3] To begin with, the ALJ noted that a narcolepsy "diagnosis alone does not fulfill the guidelines of the listing," and so permissibly found that Dr. Burns's general remarks about the disabling severity of a narcolepsy diagnosis were of little help in assessing the severity of Page's particular limitations. (Tr. 23). More importantly, the ALJ found that Dr.

---

[3] To the extent Dr. Burns concluded that Page's limitations were so severe as to be disabling, his opinion was contradicted by that of the state agency physician and Rebecca Sturdevant, a nonphysician health care provider who examined Page in association with consultative physician Dr. Greg Vanichkachorn. Tr. 257-59; 260-67. Even assuming Dr. Burns' opinion was not contradicted, however, the ALJ gave clear and convincing reasons for rejecting it. *See e.g. Lester v. Chater*, 81 F.3d 821, 830-32 (9th Cir. 1995) (an ALJ must provide specific, legitimate reasons for rejecting a controverted opinion of a treating physician, and give clear and convincing reasons for rejecting an uncontroverted opinion).

Burns' opinion was not supported by his own treatment notes, which reflected that Parge's narcolepsy was largely controlled with Ritalin (Tr. 24). The ALJ observed that Dr. Burns' records did not "mention or suggest marked neurological consequences or marked mental limitations due to narcolepsy." (Tr. 24) As an example, the ALJ noted that Dr. Burns wrote after seeing Page for the last time on July 7, 2011 that "[h]e continues on Ritalin 10 mg two in the morning and two in the early afternoon with good results." (Tr. 24, 354). The ALJ also cited Dr. Burns' observations after seeing Page in August 2010, approximately four months after his alleged onset date, at which time he wrote that "Ritalin has continued to work well for him and he is not in need of any changes." (Tr. 24, 270).

Page returned to Dr. Burns in September 2010, complaining of fragmented sleep notwithstanding the fact that he was continuing on his Ritalin. (Tr. 269). It was at this point that Dr. Burns considered the possibility that Page might "be having some depression" because he was going through a divorce. (Tr. 269). Dr. Burns prescribed a trial of Xyrem "to induce a power-type of sleep". (Tr. 269). Dr. Burns saw Page next on January 31, 2011, at which time he found that "things have been fairly stable for him and it does not sound as though we need to make any changes with therapy." (Tr. 268). Page advised Dr. Burns that he too felt he

was "stable with regards to his condition" and saw no reason to make any changes either. (Tr. 268). The last time Dr. Burns saw Page was on July 7, 2011, when he again wrote that Page was having good results on Ritalin. Tr. (354).

By that time, Dr. Burns had been treating Page "as a charity case" for a few years. Dr. Burns told Page during that visit that he was going into solo practice and would no longer be able to continue seeing him unless he could afford to make payments. (Tr. 354). He encouraged Page to ask his primary care physician, Dr. Lisa Fleischer, to continue writing his prescriptions, and also informed him that he could establish care at the Community Health Center. (Tr. 354). There is no indication that Page did either of these things. In any event, the ALJ permissibly found that Dr. Burns' contemporaneous treatment notes simply did not support his subsequent opinion that Page met the criteria for presumptive disability under Listing 3.10 and 12.02. *See Thomas v. Barnhart,* 278 F.3d 947, 957 (9th Cir. 2002) (the ALJ may reject a treating physician's opinion if it is "brief, conclusory, and inadequately supported by clinical findings").

The ALJ also discounted Dr. Burns' opinion to the extent it was apparently based on Page's "allegation that he is disabled if he cannot get a [commercial drivers licence] and is therefore unable to do his usual past work as a truck

driver." (Tr. 24). In July 2007, Dr. Burns advised the Montana Department of Justice's Motor Vehicle Division that Page was being treated for narcolepsy. (Tr. 274). Dr. Burns was concerned that if Page lost commercial drivers license, he would likely "have to apply for permanent and total disability as this is the only occupation he has been doing for a number of years now." (Tr. 274). The Division of Motor Vehicles thereafter required Page to submit a doctor's statement every 12 months in order to keep his license. (Tr. 294). As the ALJ noted, Dr. Burns apparently provided those statements on Page's behalf and Page continued working as commercial truck driver until his alleged onset date in May 2010. (Tr. 24, 25, 27). In fact, Page testified that as of the date of his hearing in March 2012, he continued to drive and Dr. Burns had never advised him not to. (Tr. 57). The ALJ permissibly found the fact that Page continued to work a commercial truck driver with Dr. Burns' approval even after being diagnosed with narcolepsy undermined Dr. Burns' opinion that his narcolepsy was so severe that it satisfied the criteria for presumptive disability under Listings 3.10 and 12.02.

The ALJ thus provided sufficiently clear and convincing reasons for discounting Dr. Burns' opinion. Notably, Page has not pointed to any other medical evidence establishing that his impairments, either alone or in combination,

meet or equal, the criteria of Listing 3.10 and 12.02.  The Court thus concludes

that the ALJ's step-three analysis is supported by substantial evidence and free of

error.

### C.    Medical Opinions

Page also claims the ALJ failed to cite sufficiently specific and legitimate

reasons for rejecting a letter Dr. Burns wrote in support of his disability

application on January 25, 2012.  (Tr. 295).  Dr. Burns stated that Page had "a

confirmed diagnosis of narcolepsy with cataplexy" and he was taking Ritalin "with

good results."  (Tr. 295).   But Dr. Burns explained that Page did "still have

components of daytime somnolence and still has occasional episodes of nap

attack", indicated that he had "been unable to have commercial driver's license"

and had "difficulty maintaining occupations due to these breakthrough episodes."

(Tr. 295).  Dr. Burns described narcolepsy as "a lifelong condition that he will

have, and, certainly, it can worsen over time as well."[4]  (Tr. 295).

The ALJ discounted this letter for essentially the same reasons.  He

explained, for example, that the letter was "not given great weight to the extent

---

[4] Because Dr. Burns general assessment of Page's ability to function in the
workplace was contradicted by that of the state agency physician and the consultative
examiner, the ALJ could reject it for specific and legitimate reasons.

that [Dr. Burns] concluded [Page was] disabled and unable to work because it [was] clearly based on his belief that [Page's] diagnosed narcolepsy should qualify him for disability if he no longer has a [commercial drivers license] to do his usual work in truck driving." (Tr. 27). Dr. Burns letter can reasonably be read as reflecting the opinion that Page is disabled because he can no long work as a truck driver. The ALJ agreed that Page could not return to his past relevant work as truck driver, but appropriately discounted Dr. Burns opinion to the extent he believed that Page's inability to perform his prior work meant that he was disabled.

More importantly, the ALJ found that "Dr. Burn's opinion that [Page] is completely disabled and unable to work is not consistent with his medical notes that indicate Ritalin has continued to provide good results on the same dosage for years." (Tr. 27). As discussed above, this reason is amply support by the record.

### D. Credibility

Page next argues the ALJ failed to cite sufficiently clear and convincing reasons for discrediting his testimony.

If the ALJ finds "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain

or other symptoms alleged," and "there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citations omitted). Page met his initial burden because he provided evidence that he has underlying impairments that could reasonably be expected to produce some degree of pain, and the ALJ did not find that he was malingering. As set forth below, however, the ALJ then provided clear and convincing reasons for finding Page's subjective testimony only partially credible.

To begin with, the ALJ observed that Page worked successfully as a truck driver until May 2010 – approximately five years after he was first diagnosed with narcolepsy. (Tr. 26). While Page did not claim to be disabled during that five year period, Dr. Burns' medical records reflect that his narcolepsy has for the most been stable and well controlled on Ritalin since his initial diagnosis in June 2005. The record reflects that Page selected May 2010 as his alleged onset date because that is when he was fired from his job for showing up late, which he claims was due to his narcolepsy. Because the medical record does not reflect any decline in Page's condition since his diagnosis, the ALJ permissibly found the fact that Page

worked successfully as a truck driver for several years after being diagnosed with narcolepsy suggested that Page was not as limited by the impairment as he claimed.  It was also reasonable for the ALJ to question Page's testimony in part because Dr. Burns "was well aware" that Page drove a truck commercially after being diagnosed, and had never advised him to stop driving

While the ALJ accepted that Page's narcolepsy was a severe impairment, he also discounted Page's testimony as to the severity of his symptoms in part because that testimony was simply not supported by the medical records.  As discussed above, Dr. Burns' treatment notes reflect that Page's narcolepsy was largely stable and well-controlled on Ritalin.  And to the extent Page complained of chronic neck and back pain, the ALJ noted that he had not taken any prescribed pain medication on a regular basis.  (Tr. 26).

The ALJ also questioned Page's testimony as to the severity of his symptoms based on the fact that he had received unemployment compensation and looked for commercial driving and warehouse work after his alleged onset date. (Tr. 26-27; 53-54). The ALJ properly relied on the fact that Page held himself out as capable of working even after his alleged onset date when assessing his credibility.  *See Copeland v. Bowen*, 861 F.2d 536, 542 (9th Cir. 1988)(stating that

a claimant who received unemployment insurance benefits apparently considered himself capable of working and held himself out as available for work).

The Court thus finds that the ALJ provided sufficiently clear and convincing reasons for finding Pages's subjective testimony only partially believable.

### E. Lay Testimony

Page next argues the ALJ erred by disregarding an April 25, 2011, written statement submitted by his former spouse Jeannette Page.

It is well-established in the Ninth Circuit that the "ALJ must consider lay witness testimony concerning a claimant's ability to work." *Stout v. Commissioner*, 454 F.3d 1050, 1053 (9th Cir. 2006) (citing *Dodrill v. Shalala*, 12 F.3d 915, 919 (9th Cir. 2003); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e)). "If the ALJ wishes to discount the testimony of lay witnesses, he must give reasons that are germane to each witness." *Stout*, 454 F.2d at 1053 (quoting *Dodrill*, 12 F.3d at 919). Competent lay witness testimony "cannot be disregarded without comment." *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996).

Jeanette reported that she had been married to Page for 20 years. (Tr. 236-38). She wrote that Page would take all day to do things that used to take him between one and three hours, that when he sat to rest he would be in a deep sleep

within five minutes. She wrote that he had difficulty waking up, slept a lot during the day, had "outrageous" moods, and was taking Ritalin and Xyrem but that she was not seeing much difference. (Tr. 236-38).

The ALJ acknowledged Jeanette's statement, and gave it "some weight given that the record documents that [Page] has sleep problems and is diagnosed with narcolepsy." (Tr. 29). But the ALJ did not accept that Page would be as limited as Jeannette's letter suggested because of the "contemporaneous medical treatments records that reflect that [Page] has continued to have a quite positive response to use of Ritalin for his narolepsy." (Tr. 29). This was a germane reason for discounting Jeanette's letter, and was supported by substantial evidence of record.

### F.    Grid Rules

Finally, Page argues the ALJ's hypothetical to the vocational expert was flawed because it did not incorporate all of the limitations identified by Dr. Burns and to which Page testified. But because the ALJ did not rely on the vocational expert's testimony, Page's argument is without merit.

After considering all of the evidence, the ALJ found that Page had the residual functional capacity to perform medium work, "except that he is to do no

climbing of ladders or scaffolds and is to avoid exposure to unprotected heights and operation of dangerous moving machinery." (Tr. 24). Because of these restrictions, the ALJ found at step four that Page would be unable to perform his past relevant work as a carpet cleaner, oil changer, and truck driver. (Tr. 29).

At step five, the burden shifted to the Commissioner to establish that, despite the claimant's limitations, he can perform other substantial gainful activity. If a claimant is able to perform the full range of jobs in a given category, the ALJ can meet this step five burden by referring to the grids, which dictate a finding of "disabled" or "not disabled" based on a claimant's exertional limitations, age, education, and prior work experience. *See e.g. Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999).

Here, the ALJ found that Page had the residual functional capacity to perform the full range of medium work. While the ALJ determined that Page was not able to climb ladders or scaffolds, and could not work around unprotected heights or operate dangerous machinery, he appropriately found that those limitations did not significantly erode the occupational base of unskilled medium work. *See* S.S.R. 83-14, 1983 WL 31254 * 2, 5; S.S.R. 85-15, 1985 WL 56857 *8. Based on Page's residual functional capacity for a full range of medium

work, age, education, and work experience, the ALJ concluded that Grid Rule 203.26 directed a finding that Page was not disabled.  Page does not argue that the ALJ erred by relying on the grids or challenge his application of Rule 203.26.  The ALJ met his step five burden of establishing that there were a significant number of jobs in the national economy that Page could perform.

IV.  **Conclusion**

For all of the above reasons, the Court concludes that the ALJ's decision is based on substantial evidence and free of legal error.  Accordingly,

IT IS RECOMMENDED that Page's motion for summary judgment be DENIED, the Commissioner's motion for summary judgment be GRANTED, and the Commissioner's decision be affirmed.

DATED this 18th day of November, 2013

Jeremiah C. Lynch
United States Magistrate Judge